VILLANTI, Judge.
 

 Oreneile Masaka appeals his convictions for attempted voluntary manslaughter and attempted robbery with a firearm, raising two issues for review. Because the trial court erred by excluding admissible evidence that was relevant to Masaka’s defense, we reverse and remand for a new trial. And to avoid error in the new trial, we also explain why, under the facts below, the trial court erred by giving the principals instruction.
 

 Facts
 

 Masaka was charged with attempted voluntary manslaughter and attempted robbery with a firearm after a cab driver was shot in Tampa. The facts presented at trial showed that Masaka and his cousin, Andrew Panzo, found themselves on the far end of town from their residence after the city buses had stopped running. They decided to flag down a cab and get a ride to their apartment complex. Having limited funds on hand, their plan was to flee from the cab at the end of the trip without paying the fare.
 

 
 *1278
 
 According to the cab driver, Jerome Loy, he picked up two men at a convenience store. Both men got in the back seat. The man who sat in the seat directly behind Loy talked to him during the trip about the upcoming Bucs’ season. The other man, who sat behind the passenger seat, did not say a word during the entire trip. In addition, the man who sat behind Loy appeared to be the bigger or taller of the two men.
 

 Loy testified that when they arrived at the apartment complex, the man who had been sitting behind him and talking to him got out of the cab and walked off. Loy turned to the man sitting on the passenger side to tell him the amount of the fare, and that man held up a gun and told Loy to “give it up.” Loy reached down and got his money and started to turn back around when the man shot him. Loy then hit the gas and ran into an electric utility box in an effort to scare the man out of the cab. When he did so, the gun went off again. After the cab hit the utility box, the shooter got out of the back seat on the driver’s side and ran off, leaving his shoes behind. Loy could not identify either of the passengers.
 

 A witness to a portion of the incident testified that the shooter got out of the cab holding a small caliber chrome gun. This same witness rushed to the cab, where he discovered Loy with a “hand full of money.” The police subsequently recovered a .25 caliber bullet from the scene. The police developed Masaka and Panzo as suspects, and Masaka was arrested later that evening.
 

 Panzo was interviewed by Detective Bryan Custer several days after the shooting. During that interview, Panzo told Detective Custer that he had had a chrome .25 caliber gun in his pocket earlier in the day and was telling people, “I’m fixin’ to rob somebody.” Panzo also told Detective Custer that he had possession of the gun used in the shooting after the incident and that he sold it to a stranger two days later. Panzo admitted to changing clothes immediately after the shooting because he knew the police would be looking for the shooter. However, he asserted that Masaka was the shooter and that he (Panzo) was the one who had fled from the cab before the shooting occurred. He also told Detective Custer that he did not talk to the cab driver at any time during the ride because that would have blown Masaka’s cover. Despite these statements, Panzo was never charged with any crimes relating to the shooting of Loy.
 

 Masaka’s defense at trial was misidenti-fication. He contended that he was the one who fled from the cab before the shooting and that Panzo was the actual shooter. In support of this defense, Masa-ka introduced evidence that he was the taller of the two men. He also sought to introduce the portions of Panzo’s post-Mi
 
 randa
 
 statement to Detective Custer in which Panzo admitted to possessing the gun used in the shooting, admitted to changing clothes after the shooting, and admitted that he remained quiet during the cab ride. The State objected to the admission of Panzo’s statements on hearsay grounds. Despite Masaka’s argument that the proffered portions of Panzo’s statement were admissible under the hearsay exception for statements against penal interest, the trial court refused to admit any portion of Panzo’s statement.
 

 During the charge conference, which occurred before the close of the State’s case, the State requested that the trial court instruct the jury on the theory of principals. Masaka objected to this instruction, arguing that the State did not charge him as a principal, there was no evidence that he was a principal to the crimes charged, and that the State had not proceeded at
 
 *1279
 
 trial on the theory that Masaka was a principal. In response, the State asserted that it would elicit evidence to support the instruction through its remaining witness. Based on the State’s representation concerning what the evidence would show, the trial court agreed to give the principals instruction over Masaka’s objection. At the close of the case, the jury convicted Masaka. He now appeals, raising two grounds for reversal.
 

 Panzo’s Statements
 

 Masaka’s primary argument on appeal is that the trial court improperly excluded the proffered portions of the statement Panzo made to Detective Custer. While we recognize that the standard of review of a trial court’s evidentiary rulings is abuse of discretion,
 
 see, e.g., Fitzpatrick v. State,
 
 900 So.2d 495, 514-15 (Fla.2005), the trial court’s discretion on evidentiary matters is limited by the rules of evidence.
 
 McDuffie v. State,
 
 970 So.2d 312, 826 (Fla.2007);
 
 Johnston v. State,
 
 863 So.2d 271, 278 (Fla.2003). Thus, we may find that a trial court has abused its discretion when “its ruling is based on an ‘erroneous view of the law or on a clearly erroneous assessment of the evidence.’ ”
 
 McDuffie,
 
 970 So.2d at 326 (quoting
 
 Cooter & Gell v. Hartmarx; Corp.,
 
 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990));
 
 see also McCray v. State,
 
 919 So.2d 647, 649 (Fla. 1st DCA 2006) (noting that a trial court’s discretion is limited by the evidence code and applicable case law and that “[a] court’s erroneous interpretation of these authorities is subject to
 
 de novo
 
 review”). Thus, we must consider the rules of evidence that govern this issue and assess the evidence presented in light of those rules.
 

 Here, Panzo did not appear at trial, and Masaka sought to admit certain portions of Panzo’s statement through the testimony of Detective Custer. Masaka agreed with the State that the proffered statements were hearsay; however, he contended that the statements were nevertheless admissible under the exception to the hearsay rule for statements that are against a declarant’s penal interest. Specifically, section 90.804(2)(c), Florida Statutes (2005), provides,
 

 (c)
 
 Statement against interest.
 
 — A statement which, at the time of its making, was so far contrary to the declar-ant’s pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant’s position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
 

 The Florida Supreme Court has held that the test for admissibility under this section is (1) whether the declarant is unavailable, and if so (2) whether the statements are relevant, (3) whether the statements tend to inculpate the declarant and exculpate the defendant, and (4) whether the statements are corroborated.
 
 See Voorhees v. State,
 
 699 So.2d 602, 613 (Fla.1997). If the proffered statements meet these admissibility requirements, the weight to be given the statements is for the jury to determine.
 
 Id.
 
 Thus, we must consider whether the proffered portions of Panzo’s statements meet these admissibility requirements.
 

 A. Availability
 

 Here, there is no dispute that Panzo was unavailable. The parties agree that Panzo failed to respond to several subpoenas for deposition. Once Panzo appeared for his deposition, he invoked his Fifth Amend
 
 *1280
 
 ment privilege and refused to testify. Since his deposition, Panzo had moved, and defense counsel had not been able to locate him. While the State allegedly obtained substitute service of process on Panzo’s mother, Panzo did not appear at trial. The trial court found that Panzo was unavailable, and this finding is not challenged on appeal. Thus, Masaka established this requirement for admitting Panzo’s statements.
 

 B. Relevance
 

 Given Panzo’s unavailability, the next question is whether the proffered evidence was relevant to Masaka’s misidenti-fication defense. Relevant evidence is defined as that which “tend[s] to prove or disprove a material fact.” § 90.401. In the context of evidence proffered by the defendant, “where evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant’s guilt, it is error to deny its admission” on relevance grounds.
 
 Rivera, v. State,
 
 561 So.2d 536, 539 (Fla. 1990);
 
 see also Story v. State,
 
 589 So.2d 939, 941 (Fla. 2d DCA 1991);
 
 Vannier v. State,
 
 714 So.2d 470, 471-72 (Fla. 4th DCA 1998).
 

 In this case, given Loy’s testimony that the man who shot him did not speak at all during the cab ride while he and the other man chatted during the ride about the upcoming Bucs’ season, Panzo’s statement to Detective Custer that he did not say anything during the cab ride tended to prove that Panzo was the man who shot Loy while Masaka was the man who got out of the cab before the shooting occurred. Further, the proffered portions of Panzo’s statements also tended to prove that he had possession of the gun both before and after the shooting and had at least some intent to commit a robbery that day. Because this evidence tends to support Masaka’s defense that Panzo was the shooter, it satisfied the relevance requirement for admissibility under section 90.804(2)(c).
 

 C. Self-Inculpatory/Excul'patory Nature of Statements
 

 The third requirement for admissibility is that the proffered evidence must tend to inculpate the declarant and exculpate the defendant. For a statement to satisfy this requirement, it need not be a full confession to a crime nor must it be facially incriminating. Instead, when discussing the comparable federal rule of evidence, the Supreme Court explained that the incriminating nature of the statement must be considered in context:
 

 [A] declarant’s squarely self-inculpatory confession-“yes, I killed X”-will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory.
 
 See Pinkerton v. United States,
 
 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well. And when seen with other evidence, an accomplice’s self-inculpatory statement can inculpate the defendant directly: “I was robbing the bank on Friday morning,” coupled with someone’s testimony that the de-clarant and the defendant drove off together Friday morning, is evidence that the defendant also participated in the robbery.
 

 Moreover, whether a statement is self-inculpatory or not can only be determined by viewing it in context.
 
 Even statements that are on their face neutral may actually be against the declarant’s interest. “I
 
 hid the gun in Joe’s apartment” may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is
 
 *1281
 
 certainly self-inculpatory. “Sam and I went to Joe’s house” might be against the declarant’s interest if a reasonable person in the declarant’s shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam’s conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant’s interest. The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant’s penal interest “that a reasonable person in the declarant’s position would not have made the statement unless believing it to be true,” and this question can only be answered in light of all the surrounding circumstances.
 

 Williamson v. United States,
 
 512 U.S. 594, 603-04, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (emphasis added).
 

 Thus, for example, in
 
 Reynolds v. State,
 
 934 So.2d 1128, 1141 (Fla.2006), the defendant was allowed to elicit from an investigating officer statements made by one Justin Pratt that Pratt had been involved in an argument with victim Danny Privett shortly before Privett’s murder and that Pratt had left a note “declaring ‘war’ against the [victim’s] family.” While these statements were not a confession to a crime and did not directly inculpate Pratt in Privett’s murder, they provided evidence of Pratt’s relationship with Privett and a motive for Pratt, rather than Reynolds, to be Privett’s murderer.
 
 Id.
 
 Further, they were made at a time when Pratt was aware of Privett’s murder and knew that he was being investigated as a result of that murder.
 
 Id.
 
 Thus, the statements were sufficiently incriminating to be admitted.
 
 Id.
 

 Similarly, in
 
 Franqui v. State,
 
 699 So.2d 1312, 1320 (Fla.1997), one of Franqui’s co-defendants gave a statement to the police explaining how he (the eodefendant) had disposed of the weapons used in the crime. Even though the codefendant did not admit to being directly involved in the murder itself, the trial court found, and the supreme court implicitly agreed, that the statements were sufficiently incriminating to be admitted under section 90.804(2)(c) because the codefendant’s “efforts to destroy evidence connect[ed] him to the crime.”
 
 Id.
 

 Here, Panzo’s statements were made to Detective Custer at a time when he knew that the police were investigating the shooting of Loy. Masaka argued that while the proffered statements might not necessarily be incriminating on their face, they were certainly against Panzo’s penal interest given his knowledge that the police were investigating this shooting. This was particularly true for Panzo’s statements that he had the gun earlier in the day and that he had disposed of it two days later. Like the codefendant’s statements in
 
 Franqui,
 
 Panzo’s statements concerning his possession and sale of the gun were sufficiently incriminating to be admissible under section 90.804(2)(c) because Panzo’s efforts to dispose of the evidence connected him to the crime. Moreover, Panzo’s explanation as to why he was silent during the cab ride was also incriminatory when considered in light of Loy’s testimony. As Masaka pointed out to the trial court, each of these statements was incriminatory when considered in context, and the statements as a whole were “certainly enough to get [Panzo] charged,” thereby putting Panzo’s penal interest into play. Thus, these statements met the “self-inculpatory” requirement for admission under section 90.804(2)(e).
 

 Turning to the issue of whether the statements were exculpatory, we note that when ruling on the admissibility of these statements before trial, the trial court
 
 *1282
 
 found that Panzo’s statements were not admissible because they did not fully exonerate Masaka. However, this is not the proper test under this requirement. For statements against interest to satisfy this statutory requirement, they do not need to fully exonerate the defendant; instead, they must only “tend to exculpate” the defendant.
 
 Carpenter v. State,
 
 785 So.2d 1182, 1203 (Fla.2001) (holding that it was improper to exclude a codefendant’s self-inculpatory hearsay statement on the grounds that the statement did not exonerate the defendant because the statement “could bolster Carpenter’s theory regarding his reduced degree of culpability”);
 
 Voorhees,
 
 699 So.2d at 613.
 

 Here, the proffered portions of Panzo’s statement did “tend to exculpate” Masaka. The statements tend to show that Panzo had possession of a gun before the shooting and that he was discussing robbing someone in the hours prior to the attempted robbery. The statements also tend to show that Panzo disposed of the gun used in the shooting. In addition, the statements concerning Panzo’s immediate change of clothes after the cab ride tend to show a consciousness of guilt. Because the proffered portions of Panzo’s statement tended to exculpate Masaka, the trial court erred in finding otherwise and excluding the statements on that basis.
 

 Further, Masaka’s request to admit Panzo’s statements was properly limited to only those statements that inculpated Panzo. When a declarant’s entire statement contains portions that are self-inculpatory and portions that are self-exculpatory but that inculpate the defendant, only the self-inculpatory portions may be admitted.
 
 Williamson,
 
 512 U.S. at 600-01, 114 S.Ct. 2431. While the trial court correctly noted that Panzo’s statement was partially self-exculpatory, it should have considered each proffered statement, rather than the entire interview as a whole, in determining whether the evidence proffered by Masaka was admissible.
 

 Here, the portions of Panzo’s statement that Masaka sought to admit were limited to those that tended to inculpate Panzo and exculpate Masaka. Thus, these statements satisfied this third requirement for admissibility, and the trial court erred in finding otherwise.
 

 D. Corroboration
 

 The final requirement for admissibility is that the self-inculpatory statements must be sufficiently corroborated so as to have “particularized guarantees of trustworthiness.”
 
 Id.
 
 at 605, 114 S.Ct. 2431. This requirement has two separate components. First, the trial court must consider the circumstances surrounding the making of the statement itself, including the language used and the setting in which the statement was made, to determine whether those circumstances tend to show that the statements are trustworthy.
 
 Machado v. State,
 
 787 So.2d 112, 113 (Fla. 4th DCA 2001) (citing
 
 Lilly v. Virginia,
 
 527 U.S. 116, 139, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)). In the context of statements made to law enforcement, the primary concern is whether the statements are unreliable because they appear to be an attempt to shift blame or curry favor.
 
 Williamson,
 
 512 U.S. at 603, 114 S.Ct. 2431. Second, the trial court must consider whether the self-inculpatory statements are consistent with both the defendant’s general version of events and the other evidence presented at trial.
 
 Carpenter,
 
 785 So.2d at 1203.
 
 Compare Perry v. State,
 
 675 So.2d 976 (Fla. 4th DCA 1996) (holding that the trial court should have granted the defendant’s request to admit statements of another occupant of a cab whose driver was shot because the statements inculpated the declarant as the shooter and there was other evidence
 
 *1283
 
 pointing to the declarant as the shooter),
 
 with Manka v. State,
 
 720 So.2d 1109 (Fla. 4th DCA 1998) (affirming the exclusion of a codefendant’s sworn statement to police because the “admissions” in that statement conflicted with the medical testimony regarding the victim’s injuries),
 
 and Allison v. State,
 
 746 So.2d 518 (Fla. 2d DCA 1999) (affirming the exclusion of hearsay statements of person who was allegedly a paramour of the murder victim’s because there was absolutely no evidence, other than the hearsay statement itself, that the alleged paramour even knew the victim). Only those statements that are sufficiently corroborated may be admitted.
 

 Here, Panzo made the statements at issue while in police custody and after being advised of his
 
 Miranda
 
 rights. Despite being aware that the police were investigating the shooting and despite being advised of his rights, Panzo made self-inculpatory statements concerning his possession of the gun used in the shooting, his intent that a robbery occur, his change of clothes after the cab ride, and his disposal of the gun after the crime had occurred. While portions of his statement did shift blame to Masaka, his statements did not shift all of the blame nor do they appear to be an attempt to curry favor with the police.
 

 In addition, contrary to the State’s argument and the trial court’s finding, Panzo’s statements were consistent with other evidence presented at trial. The totality of Panzo’s statement was consistent with the evidence (1) that the cab was flagged down at a convenience store on the opposite side of town from the shooting, (2) that the gun used in the crime was a chrome .25 caliber pistol, and (3) that the victim had money in his hands when the first shot was fired. While some witnesses knew some of these facts, no one except someone involved in the crime itself would have had knowledge of all of these facts.
 

 Further, Panzo’s statement was consistent with Masaka’s general version of the events. Loy testified that the taller of the two men sat immediately behind the driver’s seat and talked to him during the drive about the Bucs. Loy testified that the other passenger, who ultimately did the shooting, did not say a word during the trip. Loy testified that the taller man who sat behind him got out before the shooting started. Masaka presented evidence that he was the taller of the two men, that he sat behind the driver’s seat, and that he talked to Loy during the ride. Panzo’s statements are consistent, at least in part, with this evidence, thus satisfying this requirement for admissibility.
 

 In finding Panzo’s statements inadmissible, the trial court found that they were not sufficiently corroborated because there was no independent evidence that Panzo was actually the shooter. However, this conclusion misses the mark. The question for the trial court was whether Panzo’s statements were sufficiently corroborated to be reliable evidence — not whether Pan-zo’s statements were so credible as to prove Masaka’s defense. All in all, Panzo exhibited a knowledge of facts that only someone connected with the crime itself would know. These facts were corroborated, at least in part, by other evidence presented at trial. Thus, his statements were sufficiently reliable to have been admitted. Once that admissibility threshold was met, the credibility of Panzo’s statements and Masaka’s defense was for the jury, not the trial court, to assess.
 

 E. Harmless Error
 

 Finally, on this record, we cannot say that the exclusion of Panzo’s statements was harmless error. Here, Masaka’s misidentification defense was corroborated in part by the victim’s own
 
 *1284
 
 testimony, and Masaka was able to impeach, to some extent, the credibility of the police officer who obtained his confession. Given the lack of incriminating forensic or eyewitness evidence, the exclusion of Panzo’s statements was not harmless.
 
 See State v. DiGuilio,
 
 491 So.2d 1129, 1135 (Fla.1986) (holding that an error is harmless only when “there is no reasonable possibility that the error contributed to the conviction”).
 

 The harmful nature of the error is further apparent by the resulting violation of Masaka’s due process rights. As a general proposition, “the right to present evidence on one’s own behalf is a fundamental right basic to our adversary system of criminal justice, and is a part of the ‘due process of law’ that is guaranteed to defendants in state criminal courts by the Fourteenth Amendment to the federal constitution.”
 
 Gardner v. State,
 
 530 So.2d 404, 405 (Fla. 3d DCA 1988) (citing
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and
 
 Chambers v. Mississippi,
 
 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). In
 
 Chambers,
 
 the Supreme Court noted that “[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.” 410 U.S. at 302, 93 S.Ct. 1038. Because the trial court’s ruling effectively denied Masaka the right to present his defense, it constituted harmful error.
 

 F. Conclusion
 

 Here, the trial court’s ruling excluding the proffered portions of Panzo’s statement was based on its erroneous view of the requirements for admissibility under section 90.804(2)(c) and its erroneous assessment of the proffered evidence. This erroneous ruling denied Masaka his due process right to present evidence in support of his defense. Accordingly, we hold that the trial court abused its discretion in excluding this evidence and that Masaka is legally entitled to a new trial.
 

 Principals Instruction
 

 Because we are remanding for a new trial, we also address Masaka’s contention that the trial court erred by instructing the jury on the law of principals. Under the circumstances presented in this case, we agree that giving this instruction was error.
 

 While it is true that the trial court has broad discretion in instructing the jury,
 
 see Kearse v. State,
 
 662 So.2d 677, 682 (FIa.1995), it is also true that a trial court errs when it gives an instruction that has no factual basis in the record,
 
 see Butler v. State,
 
 493 So.2d 451, 452 (Fla. 1986);
 
 Lovette v. State,
 
 654 So.2d 604, 605 (Fla. 2d DCA 1995);
 
 Lewis v. State,
 
 693 So.2d 1055, 1057 (Fla. 4th DCA 1997) (holding that “it is generally error to instruct the jury on principals where there is no evidence to support an aiding and abetting theory of guilt”). Thus, giving the principals instruction is error when there is no evidence that the defendant had a conscious intent that the crime be committed and did some act or said some word which was intended to and in fact did incite a third party to commit the crime with which the defendant is charged.
 
 See Wells v. State,
 
 967 So.2d 418, 419 (Fla. 1st DCA 2007);
 
 see also
 
 Fla. Std. Jury Instr. (Crim.) 3.5(a).
 

 For example, in
 
 Lovette,
 
 Lovette was charged with grand theft and burglary arising out of the alleged theft of property from the victim’s residence. 654 So.2d at 605. The evidence at trial showed that two neighbors had seen Lovette coming out of the back door of the victim’s residence carrying two boxes.
 
 Id.
 
 Shortly thereafter, the victim returned home and discovered that a window air conditioner,
 
 *1285
 
 two televisions, and two boxes of clothes were missing from the residence.
 
 Id.
 

 Lovette testified that he did not enter the victim’s apartment on the night in question.
 
 Id.
 
 He testified that the neighbors saw him carrying two boxes of his own belongings to his mother’s residence, which was near the victim’s residence.
 
 Id.
 
 Lovette testified that while he was at his mother’s residence, the neighbors asked him to come to their apartment, where they showed him two shopping carts full of items, including a television and two boxes.
 
 Id.
 
 He testified that the neighbors offered to trade him the items in the eai'ts for crack cocaine, which Lovette agreed to do.
 
 Id.
 
 However, Lovette took the items and kept the cocaine.
 
 Id.
 
 He testified that the neighbors had accused him of burglarizing the victim’s residence in retaliation for his keeping the crack cocaine.
 
 Id.
 
 Lovette did, however, admit that he believed the items in the shopping carts were stolen when he accepted them from the neighbors.
 
 Id.
 

 At the State’s request, the trial court read the jury the principals instruction over the defense objection.
 
 Id.
 
 In reversing, this court noted that there was no evidence that Lovette acted in concert with anyone in committing either the grand theft or the burglary.
 
 Id.
 
 at 606. Either Lovette committed these crimes himself as the neighbors testified or he did not. “The only evidence of any concerted effort would have been with respect to dealing in stolen property....”
 
 Id.
 
 However, Lovette was not charged with that offense.
 
 Id.
 
 Thus, this court held that because there was no evidence to support the theory that Lovette acted in concert with anyone to commit the crimes with which he was charged, instructing the jury with the principals instruction was error.
 
 Id.
 

 Likewise in this case, the State presented no evidence that Masaka acted in concert with anyone to commit the crimes with which he was charged. The State’s evidence showed that two men initially got into the cab with the intent of committing a petit theft by riding without paying. However, when they got to their destination, one man got out of the cab and fled, in keeping with the stated plan, while the other deviated from the plan by remaining in the cab and shooting and attempting to rob the cab driver. There was no evidence presented by either the State or the defense that the person who fled, be it Masaka or Panzo, had a conscious intent that either a robbery or attempted murder be committed and did some act or said some word intended to incite the other to commit the crime. While there was evidence of a concerted intent to commit petit theft by riding without paying, Masaka was not charged with that offense. Thus, there was no evidentiary basis to support the trial court’s decision to give the principals instruction.
 

 In this appeal, as in the trial court below, the State argues that the principals instruction was supported by the evidence that Masaka was in the cab with the intent to “skip out on the fare.” However, this argument misstates the law. Masaka’s mere presence at the scene of an offense is insufficient to support giving the principals instruction.
 
 See Wells,
 
 967 So.2d at 419. Further, Masaka’s intent to commit petit theft does not “transfer” to the crimes with which he was charged in the absence of some evidence that he intended either of them to be committed and did some act or said some word intended to incite Panzo to commit them.
 
 See Lovette,
 
 654 So.2d at 606. Because no such evidence was presented, giving the principals instruction was error.
 

 Moreover, on the record before us, we cannot say that this error was harmless. The record shows that the
 
 *1286
 
 State made the erroneous legal argument in closings that Masaka could be convicted of the charged crimes as a principal based solely on his presence in the cab with the intent to commit the petit theft. Because of this misstatement of the law and the lack of any evidence that the man who fled the cab intended the shooting and robbery to occur, the jury could easily have been misled by the principals instruction.
 
 See, e.g., Lewis,
 
 693 So.2d at 1057 (holding that for an erroneous jury instruction to result in harmful error, the instruction must “be capable of misleading the jury in such a way as to prejudice the defendant’s right to a fair trial”). Further, there is no way for us to determine from the verdict form whether the jury found Masaka guilty because it believed that he was the shooter or because it believed he was simply present in the cab. Accordingly, under the facts of this case, the error in giving the principals instruction was not harmless.
 

 Finally, we note that the problem with the principals instruction arose in part because the trial court held the charge conference before the close of the State’s case. In seeking the principals instruction during the charge conference, the State admitted that it had not yet presented any evidence to support the instruction, but it represented to the court that Detective Morgan would testify that Masaka told her that he intended to participate in the robbery but did not intend for any shooting to occur. However, when the State actually called Detective Morgan to testify the next day, no such testimony was elicited. Instead, the only testimony elicited from Detective Morgan on this issue was that Ma-saka admitted to being “present at the scene.” Despite the error of the State’s representations, the trial court did not revisit its decision to give the principals instruction after the State’s case was closed. Thus, the trial court ultimately gave an instruction that was not supported by the evidence actually developed at the trial.
 

 We do not fault the trial court for the timing of the charge conference. Instead, we simply point out that rulings on jury instructions that are based on what a party asserts the evidence “will be” should be revisited after both parties have rested their cases so that the court can confirm that the evidence actually elicited was consistent with the parties’ earlier representations. Thus, on remand, should the State again seek the principals instruction, the trial court must ensure that the instruction is supported by the evidence actually presented at trial before actually so instructing the jury.
 

 Reversed and remanded for a new trial.
 

 FULMER and KELLY, JJ., Concur.